UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MICHIGAN

AHMED ELZEIN,

        Plaintiff,

v.

ASCENSION GENESYS HOSPITAL,

        Defendant.
_____/

Case No. 22-cv-
Hon.

ERIC STEMPIEN (P58703)
STEMPIEN LAW, PLLC
Attorneys for Plaintiff
38701 Seven Mile Rd., Suite 130
Livonia, MI 48152
(734)744-7002
eric@stempien.com
_____/

## COMPLAINT AND JURY DEMAND

Plaintiff, Ahmed Elzein, by and through his attorneys, Stempien Law, PLLC, hereby complains against Defendant Ascension Genesys Hospital, and in support thereof states:

1. Plaintiff Ahmed Elzein ("Elzein" or "Plaintiff") is a resident of the Township of Westchester, Butler County, Ohio.

2. Defendant Ascension Genesys Hospital ("Ascension" or "Defendant") is a Michigan nonprofit corporation with its principal place of business located in the City of Grand Blanc, Genesee County, Michigan.

1

3. Jurisdiction is vested with this Court pursuant to 28 USC §1331 and 42 USC §12101, et. seq.

4. This Court has supplemental jurisdiction over Plaintiff's the state law claims pursuant to 28 USC § 1367.

5. On or about May 12, 2021, Elzein filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC).

6. On or about July 13, 2022 the EEOC issued a Right to Sue letter to Elzein.

## GENERAL ALLEGATIONS

7. Elzein was employed at the Ascension hospital in Grand Blanc, Michigan as a physician.

8. Elzein is an African-American male, who was born and raised in the county of Sudan.

9. Elzein practices the religion of Islam.

10. Elzein was placed in Ascension's first-year residency program starting in July 2020.

11. The first-year residency program was managed by the Program Director, Barbara Pawlaczyk ("Pawlaczyk").

12. In the first few months of his residency, Elzein received several good patient reviews for his work.

13. In August 2020, a white female resident physician of Ascension called Elzein a "n****r".

14. In October 2020, while Elzein was praying in a private area at the hospital, a white male resident physician of Ascension told Elzein to "go back to where you came from".

15. In the fall of 2020, a white male resident physician, when referring to African-American culture, referred to it as "sputum culture"

16. In the fall of 2020, a white female resident would mock the names of employees and patients who had ethnic-sounding names, particularly names that sound like they originated in Africa.

17. Many of Elzein's fellow residents would mock him and tell him that he should just leave the residency program at Ascension.

18. In the fall of 2020, Elzein complained to Pawlaczyk about the racist harassment that he was receiving from his fellow residents.

19. Pawlaczyk told Elzein that he was being "delusional" and did not know what he was talking about.

20. In October 2020, Elzein was placed on a rotation providing medical services to patients at Ascension's outpatient clinic.

21. During his rotation, one of the senior physicians instructed Elzein to take a phone call from an angry patient; the angry patient complained that she had

been misdiagnosed by one of the senior physicians at the clinic. Elzein informed the patient that she could file a complaint with the hospital.

22. In September 2020, Pawlaczyk asked Elzein to come to a meeting at her office; during this meeting, Pawlaczyk placed Elzein on a remediation plan and criticized his work at the clinic. Her criticisms included outlandish allegations, including that he had placed his stethoscope on a patient's abdomen when trying to listen to their heart, implying that Elzein did not know where the heart is located within the body.

23. During the meeting referenced above, Pawlaczyk also criticized the fact that Elzein had attended medical school in the country of Sudan; she told him that "what you are doing is not what we do in the United States".

24. Pawlaczyk's proposed remediation plan referenced above was never implemented by Ascension.

25. In early November 2020, Elzein was rotated back to the main hospital at Ascension.

26. During this rotation, on or about November 10, 2020, Elzein was instructed by the Chief Resident to go into the room of a physically combative patient.

27. Elzein informed the Chief Resident that he would do so but would need to have another person come with him because he was unable to properly restrain the patient by himself.

4

28. The Chief Resident was angry but did agree to go into the room with Elzein.

29. Following that incident, the Chief Resident informed Pawlaczyk about Elzein requesting a second Ascension employee for the combative patient.

30. Pawlaczyk was furious at Elzein for his request.

31. On or about November 11, 2020, Elzein was in the resident lounge area of the hospital at approximately 6:00 a.m.

32. An unfamiliar person wearing a physician's coat entered the resident lounge and placed an unseen item into a locker; this unknown person did not appear to be wearing any badge or other identifying information.

33. Elzein decided to inform the hospital security of the incident so that they could ensure that it was not a dangerous item.

34. Hospital security determined that there was no threat to the hospital.

35. A co-worker then approached Elzein and asked him why he called security; he informed her about the suspicious behavior of the person who had entered the lounge area, but also told her about the harassment described above. This co-worker told Elzein that he was "making this up" and that she was contacting Pawlaczyk.

36. Pawlaczyk then called Elzein and he informed her, again, about the harassment and racism; Pawlaczyk told him that he was "delusional" and asked him to take the next two days off work.

37. Elzein began feeling overwhelmed so he stepped outside of the hospital; two resident physicians came outside to him and asked him to come back in to "get a smoothie with us".

38. When they arrived at the cafeteria, Pawlaczyk came in and again told him that he was delusional and that he needed to go to the emergency room for a psychiatric evaluation; she also accused Elzein of lying.

39. Elzein told her unequivocally that he was not delusional, and was feeling fine except for the stress caused by her telling him that he was fabricating the harassment that he had suffered.

40. Elzein also told Pawlaczyk that he did not need to go to the emergency room.

41. Pawlaczyk then had a psychologist who works at the hospital come to the cafeteria to speak with Elzein.

42. The psychologist told both Elzein and Pawlaczyk that Elzein is fine and does not need to go to the emergency room.

43. Even after the psychologist left, Pawlaczyk insisted that Elzein go to the emergency room, and had hospital security come to the cafeteria to forcibly take Elzein to the emergency room.

44. While in the emergency room, Elzein informed the physicians that he was not delusional and did not require hospital treatment for any mental health issues.

45. Upon information and belief, the emergency room physicians spoke with Pawlaczyk who falsely told them that Elzein had reported to security that a bomb had been planted in the resident lounge; she further falsely stated that Elzein had reported that another resident had placed a dangerous item in the pocket of his physician coat.

46. Based on these false statements from Pawlaczyk, the emergency room physician had Elzein involuntarily committed to Havenwyck Hospital in Oakland County, Michigan.

47. Upon information and belief, no order of commitment was ever entered by the Probate Court for Elzein.

48. Elzein was involuntarily held at Havenwyck Hospital for five days; the staff at Havenwyck did not inform Elzein's family as to his whereabouts; Elzein's family was frantically trying to locate him for several days.

49. Finally, Elzein's father, who is also a physician, was able to locate Elzein at Havenwyck.

50. When Elzein's father came to Havenwyck, the physicians there instantly agreed to discharge Elzein.

51. Elzein's physician cleared him to return to work without any restrictions.

52. Despite this clearance, Pawlaczyk and Ascension refused to allow him to return to work without first being examined by a physician at Ascension Genesys Hospital.

53. The Ascension Genesys hospital physician also cleared Elzein to return to work; however Pawlaczyk again refused to accept that return to work and ordered Elzein to attend an examination with an occupational health physician at Ascension Providence hospital in Southfield.

54. Elzein was understandably concerned that Pawlaczyk was simply searching for a physician that would determine that he was not fit to return to work.

55. Elzein did attend the third return to work examination but left early.

56. Pawlaczyk told Elzein that if he did not attend the examination with the Providence Southfield occupational health physician, he would not be allowed to return to work.

57. On or about December 14, 2020, Ascension discharged Elzein from his employment and from his first-year residency program.

58. Elzein was never suffering from "paranoid delusions" as falsely and maliciously claimed by the Defendant's representatives; these untrue allegations from Pawlaczyk came only after Elzein complained about the racial and religious based harassment that he suffered; these false allegations were made because Pawlaczyk either refused to believe that Elzein could have

been the victim of racial and religious harassment or because Pawlaczyk was intentionally trying to discredit Elzein.

## COUNT I
## VIOLATION OF AMERICANS WITH DISABILITIES ACT
## DISABILITY DISCRIMINATION

59. Plaintiff hereby incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein.

60. Plaintiff was a qualified individual with a perceived disability, as that term is defined by the Americans with Disabilities Act, and 42 USC §12101, et seq. ("ADA").

61. Plaintiff is disabled pursuant to the ADA because Defendant regarded him as being disabled when he was ordered to the emergency room at Ascension Genesys Hospital and involuntarily committed to Havenwyck Hospital.

62. The perceived disability was a mental health disorder involving paranoid delusions.

63. A mental health disorder involving paranoid delusions is a serious disease that can cause long-term symptoms.

64. A mental health disorder involving paranoid delusions is a serious disease that can cause non-minor symptoms even if it lasts less than six months.

65. Defendant was aware of Plaintiff's perceived disability.

66. Defendant suspended Plaintiff from his job duties, had him involuntarily committed to a mental health hospital and ultimately discharged him from his employment and the residency program due to his perceived disability.

67. As a direct and proximate result of Defendant's violation of the ADA, Plaintiff has suffered damages, including but not limited to: suspension of job position, lost past and future wages, lost past and future employment benefits, loss of earning capacity, emotional distress, and attorney fees.

### COUNT II
### VIOLATION OF TITLE VII OF CIVIL RIGHTS ACT
### RACE AND NATIONAL ORIGIN BASED HARASSMENT

68. Plaintiff hereby incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein.

69. Plaintiff was a member of a protected class based on his race (Black) and his national origin (Sudanese).

70. Plaintiff was subjected to unwelcome harassment based upon his race and national origin as more fully described above.

71. The harassment had the effect of unreasonably interfering with Plaintiff's work performance and created an intimidating, hostile and offensive work environment.

72. Defendant had actual and constructive notice of the racial and national origin harassment.

73. Defendant unreasonably failed to take prompt and remedial action.

74. As a direct and proximate result of Defendant's violation of Title VII of the Civil Rights Act, Plaintiff has suffered damages as fully set forth in paragraph 67 of this Complaint.

## COUNT III
## VIOLATION OF TITLE VII OF CIVIL RIGHTS ACT
## HARASSMENT BASED ON RELIGION

75. Plaintiff hereby incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein.

76. Plaintiff was a member of a protected class based on his religion (Muslim).

77. Plaintiff was subjected to unwelcome harassment based upon his religion as more fully described above.

78. The harassment had the effect of unreasonably interfering with Plaintiff's work performance and created an intimidating, hostile and offensive work environment.

79. Defendant had actual and constructive notice of the harassment based on religion.

80. Defendant unreasonably failed to take prompt and remedial action.

81. As a direct and proximate result of Defendant's violation of Title VII of the Civil Rights Act, Plaintiff has suffered damages as fully set forth in paragraph 67 of this Complaint.

## COUNT IV
## VIOLATION OF TITLE VII OF CIVIL RIGHTS ACT
## RETALIATION

82. Plaintiff hereby incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein.

83. In the fall of 2020, Plaintiff complained to Pawlaczyk, his supervisor, about the race, national origin and religious-based harassment.

84. Pawlaczyk refused to investigate or take any action in response to Plaintiff's complaints regarding the harassment and instead accused Plaintiff of being "paranoid" and "delusional".

85. In further retaliation for Plaintiff's harassment complaints, Defendant held Plaintiff against his will at the Ascension Genesys emergency room, had him transferred to Havenwyck Hospital against his will and never sought authority from a court of competent jurisdiction for his involuntary commitment to a mental health facility.

86. In addition, Defendant retaliated against Plaintiff by suspending him from his employment and ultimately discharging him.

87. As a and proximate result of Defendant's violation of Title VII of the Civil Rights Act, Plaintiff has suffered damages as fully set forth in paragraph 67 of this Complaint.

## COUNT V
## FALSE IMPRISONMENT

88. Plaintiff hereby incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein.

89. During the period of time that Plaintiff was held in the Ascension Genesys emergency room by Defendant, and during the transfer from Ascension Genesys to Havenwyck Hospital, Defendant initiated and maintained Plaintiff's confinement without any right or authority to do so.

90. Defendant intended to confine Plaintiff against his will.

91. Defendant did in fact confine Plaintiff against his will.

92. Plaintiff was conscious of his confinement.

93. Defendant's act of confining Plaintiff resulted in an unlawful restraint of Plaintiff's liberty and freedom of locomotion.

94. As a direct and proximate result of Defendant's false imprisonment of Plaintiff, Plaintiff suffered damages as fully set forth in paragraph 67 of this Complaint.

WHEREFORE, Plaintiff Ahmed Elzein prays that this Honorable Court enter a judgment in his favor against Defendant Ascension Genesys Hospital in an amount that this Court deems fair and just, plus costs, interest and attorney fees.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury of the within cause.

                                          STEMPIEN LAW, PLLC

                                          */s/ Eric Stempien*
                                          By: Eric Stempien (P58703)
                                          Attorney for Plaintiff

Dated: October 4, 2022