*EXHIBIT 4*

AHMED ELZEIN vs ASCENSION GENESYS HOSPITAL
PAWLACZYK, BARBARA 10/13/2023
Job 26456

Page 1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

AHMED ELZEIN,
  Plaintiff,    Case No. 22-cv-12352
v              Hon. Sean F. Cox
ASCENSION GENESYS HOSPITAL,    Magistrate Judge:
  Defendant.   Curtis Ivy, Jr.

DEPOSITION OF: BARBARA PAWLACZYK (VIA ZOOM)

DATE:     October 13, 2023
TIME:     2:12 p.m.
LOCATION: Fortz Legal Support, LLC
          25 Division Avenue South, Suite 325
          Grand Rapids, Michigan
REPORTER: Kelly M. Kane, CSR-1470

Page 2

1  APPEARANCES:
2
3    STEMPIEN LAW, PLLC
4    BY:  Eric Stempien (P58703)
5         38701 Seven Mile Road, Suite 130
6         Livonia, MI 48152
7         (734)744-7002
8         Eric@stempien.com
9           On behalf of Plaintiff
10
11   JACKSON LEWIS, P.C.
12   BY:  Daniel C. Waslawski (P78037)
13        2000 Town Center, Suite 1650
14        Southfield, MI 48075
15        (248)936-1900
16          On behalf of Defendant

Page 3

1              I N D E X
2  WITNESS:                         PAGE
3  BARBARA PAWLACZYK
4    Examination by Mr. Stempien     4
5
6
7            E X H I B I T S
8  NUMBER                           PAGE
9  Deposition Exhibit Number 5       78
10 Deposition Exhibit Number 11      69
11 Deposition Exhibit Number 12      55
12 Deposition Exhibit Number 14      61
13 Deposition Exhibit Number 16      43
14      (Exhibits were retained.)

Page 4

1             Grand Rapids, Michigan
2             October 13, 2023; 2:12 p.m.
3                   * * *
4         COURT REPORTER: Counsel, before I swear in the
5  witness do you agree that I can administer the oath
6  although I am in a remote location from the witness?
7         MR. STEMPIEN: For Plaintiff, no objection.
8         MR. WASLAWSKI: Dan Waslawski for Defendant,
9  agreed.
10        BARBARA PAWLACZYK, MD,
11 having been first duly sworn to tell the truth, the whole
12 truth, and nothing but the truth, was examined and
13 testified as follows:
14             E X A M I N A T I O N
15 BY MR. STEMPIEN:
16 Q.  Ma'am, would you please state and spell your full name?
17 A.  **Barbara Pawlaczyk. So it's B-a-r-b-a-r-a, and my last name**
18 **is, P, like Peter, a-w-l-a-c-z-y-k.**
19        MR. STEMPIEN: Let the record reflect that this is
20 the discovery deposition of Dr. Barbara Pawlaczyk, taken
21 pursuant to Notice, to be used for all purposes allowed
22 under the Rules of Procedure and the Rules of Evidence.
23 BY MR. STEMPIEN:
24 Q.  Dr. Pawlaczyk -- I'm going to butcher it, and I'm Polish so
25     I should be able to get this right, but somehow I --

AHMED ELZEIN vs ASCENSION GENESYS HOSPITAL
PAWLACZYK, BARBARA 10/13/2023
Job 26456

### Page 25

1  Q.  Is it that you just don't recall what he told you?
2  A.  I don't recall detailed conversation with him.
3  Q.  Well, did Dr. Vogel tell you that he thought that Dr. Elzein
4      needed to go to the emergency room?
5  A.  He said that would be beneficial for him to go to the
6      emergency room.
7  Q.  Okay. And that's what I asked you before. What did he tell
8      you about Dr. Elzein's mental health?
9  A.  Are you asking me -- I'm not sure if -- are you asking me
10     for his recommendations or his opinion about Dr. Elzein's
11     mental health? Like I'm not really sure of -- what are you
12     asking me right now.
13 Q.  I'm asking you what Dr. Vogel told you. That's all I'm
14     asking you.
15 A.  Well, so he said that will be beneficial for Dr. Elzein to
16     go to the emergency room to be evaluated.
17 Q.  Do you recall anything else that Dr. Vogel told you?
18 A.  If I recall correctly he said that he didn't know him that
19     well.
20 Q.  That's just a couple too many pronouns, he and him.
21 A.  Okay.
22 Q.  So you're saying Dr. Vogel said -- and if I were to use
23     quotes, he said, "I don't know Dr. Elzein very well." Is
24     that what Dr. Vogel told you?
25 A.  That's correct.

### Page 26

1  Q.  Okay. What was your understanding of what he was saying to
2      you with that statement?
3  A.  What was my understanding of --
4  Q.  Yes. So when Dr. Vogel said to you, "I don't know him very
5      well," what was your understanding of what he was saying to
6      you with that statement?
7  A.  That it would be for Dr. Elzein's benefit to be evaluated in
8      the emergency room.
9  Q.  Do you know if Dr. Vogel created any kind of written record
10     as a result of his interview with Dr. Elzein that day?
11 A.  Not that I'm aware of.
12 Q.  Did you ever hear Dr. Vogel tell Dr. Elzein that he should
13     go to the emergency room?
14 A.  I don't recall hearing that.
15 Q.  Did Dr. Vogel leave the area then after you had this
16     conversation with him?
17 A.  Yes.
18 Q.  Was Dr. Baj with you when Dr. Vogel made these statements to
19     you?
20 A.  I don't know if she -- she was with me all the time, but I
21     don't know if she was -- I don't recall if she was next to
22     me when Dr. Vogel and I had this discussion.
23 Q.  After Dr. Vogel leaves, what happens next?
24 A.  At the beginning, when we said -- when we asked Dr. Elzein
25     to go to the emergency room to be checked, he was in

### Page 27

1      agreement. He asked us to -- he was in agreement to go to
2      the emergency room; however, he said that he would like one
3      of his friends to go to the emergency room together with
4      him, so wanted to make a phone call. So we -- Dr. Baj,
5      she lent him a charger, because he wanted to charge his
6      phone, and then he called his friend. Or I don't know who
7      he called, but he called someone.
8          And when he came back to the table he said that he
9      would not go to the emergency room, that his friend advised
10     him not to go to the emergency room.
11 Q.  And what did you tell him in response to that?
12 A.  I told him that it would be in his best interest to go to
13     the emergency room because we were concerned about his
14     well-being, and we asked him why did he change his decision.
15 Q.  And what did he tell you?
16 A.  He said that his friend advised him not to go. He would not
17     give us any more explanation.
18 Q.  And what did you do in response to that?
19 A.  Again, we tried to -- we tried to continue the conversation
20     and tell him that it's in his best interest to be checked
21     and evaluated in the emergency room.
22 Q.  And what happened when you did that?
23 A.  He wanted to call his friend again. Because I think he
24     called him twice. And once he came back he said still that
25     he didn't want to go.

### Page 28

1  Q.  And what action, if any, did you take as a result of that?
2  A.  So I called Dr. Vosburgh, who is an associate employee,
3      associate health employee, seeking his advice on the next
4      steps.
5  Q.  And what did Dr. Vosburgh tell you?
6  A.  Dr. Vosburgh advised me to take Dr. Elzein to the emergency
7      room.
8  Q.  Despite his refusal to go?
9          Did you -- well, let me just ask you, did you tell
10     Dr. Vosburgh that Dr. Elzein said he did not want to go to
11     the emergency room?
12 A.  That's correct.
13 Q.  And Dr. Vosburgh said to take him there anyway, correct?
14 A.  Yes.
15 Q.  Why did you include Dr. Vosburgh in this situation?
16 A.  Dr. Vosburgh -- I called him because he already was familiar
17     with Dr. Elzein's underperformance.
18 Q.  As far as you know is Dr. Vosburgh a psychiatrist?
19 A.  No.
20 Q.  Is he a mental health professional in any way?
21 A.  No.
22 Q.  Do you believe he was at all qualified to make that call as
23     to whether he should go to the emergency room?
24 A.  Yes.
25 Q.  Did Dr. Vosburgh talk to Dr. Elzein?

AHMED ELZEIN vs ASCENSION GENESYS HOSPITAL
PAWLACZYK, BARBARA 10/13/2023
Job 26456

Page 29

1  A. At that time or --
2  Q. Right, at the table, I mean, when you guys are still in the
3     food court.
4  A. Not that I'm aware of.
5  Q. All right. So after Dr. Vosburgh says take Dr. Elzein to
6     the emergency room, what happened?
7  A. I continued -- Dr. Baj and I continued conversation with
8     Dr. Elzein, trying to convince him to go to the emergency
9     room for his own safety, because we were concerned about his
10    safety.
11        So Dr. Vosburgh told me that if Dr. Elzein would
12    not like to go by himself then I should call for some
13    assistance, maybe from the security, that would help me to
14    escort Dr. Elzein to the emergency room.
15 Q. Did Dr. Vosburgh have the authority to have somebody
16    involuntarily taken to the emergency room?
17        MR. WASLAWSKI: Objection, lack of foundation.
18    You can go ahead and answer, Doctor.
19        THE WITNESS: Did you say that's okay for me to
20    answer?
21        MR. WASLAWSKI: Yes, you can answer, you can
22    answer.
23        THE WITNESS: Okay. Thank you.
24    I'm not aware of Dr. Vosburgh's privileges, if I
25    may call it this way.

Page 30

1  BY MR. STEMPIEN:
2  Q. Dr. Pawlaczyk, do you have the authority to have Dr. Elzein
3     taken to the emergency room against his will?
4  A. I think that I have responsibilities for my residents and
5     for their safety and their well-being.
6  Q. And you did in fact call security, correct?
7  A. I'm sorry?
8  Q. You did in fact call security, right?
9  A. There was a security officer at the entrance, and so I asked
10    for assistance.
11 Q. Right. You went to security and brought them into the
12    situation, correct?
13 A. Yes.
14 Q. And were you prepared, if necessary, to have Dr. Elzein
15    forcibly taken to the emergency room?
16 A. I didn't know what to expect.
17 Q. What was the purpose of having security come over to
18    Dr. Elzein?
19 A. To escort him to the emergency room if needed.
20 Q. Forcibly, correct?
21 A. I don't know.
22 Q. Okay. People don't normally have to have security escort
23    them to the emergency room, correct?
24 A. I don't -- I'm sorry, I don't know.
25 Q. Well, the reason to include security was because -- in case

Page 31

1     it needed to be done forcibly. That was the reason that you
2     wanted to include security, correct?
3  A. I wanted to get -- I wanted security to assist if needed.
4     But what that assistance would entail, I don't know.
5  Q. What did you tell the security guard at the entrance?
6  A. I asked them to -- I did tell them that we may need help to
7     escort Dr. Elzein to the emergency room.
8  Q. What action, if any, did security take as a result of that
9     request?
10 A. They just -- they just approached -- they were nearby the
11    table where we were sitting, but they -- basically they were
12    standing up close to other people.
13 Q. How many security guards?
14 A. If I recall correctly there was one, I think there was one.
15 Q. Did that security guard interact with Dr. Elzein, that you
16    saw?
17 A. Not that I recall, no.
18       MR. WASLAWSKI: Eric, when you finish up this line
19    of questioning regarding security can we just take a brief
20    five-minute break?
21       MR. STEMPIEN: Yes, that's a good idea.
22 BY MR. STEMPIEN:
23 Q. All right. So what happened once the security guard came
24    over to the table?
25 A. We continued our conversation with Dr. Elzein, because at

Page 32

1     times he appeared like he was willing to go to the emergency
2     room and at times it looked like he did not.
3  Q. Okay. I understand. So you had that conversation, and then
4     what happened while you were continuing to talk to him? At
5     some point did he agree to go?
6  A. Yes, he did.
7  Q. And that was at a time when the security guard was already
8     standing over by the table, correct?
9  A. Not -- the security guard was maybe like three or five feet
10    away. So he was not standing, like, right at the table.
11 Q. Do you know if Dr. Elzein saw the security guard come over
12    to the table?
13 A. I think he did.
14 Q. Once he agreed to go to the emergency room did you then take
15    him over to the emergency room?
16 A. Yes.
17 Q. And who was escorting him? Was it just you?
18 A. It was me and Dr. Baj.
19 Q. Did the security guard go with you?
20 A. No.
21 Q. Did Dr. Elzein walk under his own power?
22 A. Yes.
23       MR. STEMPIEN: All right. Why don't we take a
24    break here and we can pick it up in about five, seven
25    minutes. What time is it? About 3:05. So between five and

8 (Pages 29 to 32)

Page 69

1   Q.  Okay. You don't recall whether he said that, but in this
2       interview either you or Helena told Marney that Dr. Elzein
3       had not mentioned the hospitalization to employee health,
4       correct?
5   A.  Right.
6   Q.  If you could -- we're going to come back to this, but if you
7       could open Exhibit 11 for me.
8   A.  Sure.
9           Yes, I found it and opened it.
10  Q.  Okay. If you could take a look at it and just let me know
11      when you're done.
12  A.  (Witness complies.)
13          Yes, I'm done reading.
14  Q.  Okay. Have you ever seen Exhibit 11 before?
15  A.  No.
16  Q.  Did Dr. Elzein give you a copy of this?
17  A.  Oh, I'm sorry, I'll take it back. I did -- I did see that
18      he sent it to me back in December.
19  Q.  All right. So a little bit later on he gave it to you?
20  A.  Not -- he emailed it to Helena.
21  Q.  He emailed it, is that what you said?
22  A.  Yes.
23  Q.  Okay. So he emailed it. All right. And did Helena show it
24      to you?
25  A.  Yes.

Page 70

1   Q.  And Helena, what was her position in November-December of
2       '22?
3   A.  Program manager.
4   Q.  Was she one of your direct reports?
5   A.  She works with me but she does not report to me.
6   Q.  Is that for internal medicine residency? Is that -- she's a
7       program manager over internal medicine --
8   A.  Yes.
9   Q.  -- residency?
10  A.  Yes.
11  Q.  What's the difference between a program manager and a
12      program director?
13  A.  The program director is a physician who is in charge of
14      the -- of the program; program manager is the -- provides
15      administrative support.
16  Q.  All right. So this is a letter from Havenwyck Hospital
17      regarding Dr. Elzein, correct?
18  A.  Yes.
19  Q.  And Dr. Elzein -- that's where he was treated after he left
20      the emergency department on November 11th, correct?
21  A.  According to the letter, yes.
22  Q.  Did you know that he had been hospitalized at Havenwyck
23      before you saw Exhibit 11 in December?
24  A.  No.
25  Q.  Nobody told you where he had been hospitalized?

Page 71

1   A.  I didn't know.
2   Q.  You knew he was in a hospital, you just didn't know which
3       one; would that be accurate?
4   A.  Yes.
5   Q.  All right. And so -- but subsequently you've come to know
6       that that was the hospital where he was an inpatient,
7       correct?
8   A.  Yes.
9   Q.  The last sentence of the first paragraph states that he can
10      return to work on 11/23/20 with no restrictions, correct?
11  A.  Yes.
12  Q.  All right. So, Doctor, this is a letter from his treating
13      facility for the condition that he was being treated for
14      when he was on his medical leave indicating he was cleared
15      to return to work November 23rd without restrictions,
16      correct?
17  A.  Correct.
18  Q.  This letter was insufficient for Ascension to be able to
19      bring him back, correct?
20  A.  Yes.
21  Q.  And why?
22  A.  Because Ascension requires the letter to be written by a
23      physician. And also the process that we have at Ascension
24      Genesys Hospital requires an employee to be seen by
25      associate health for employee to be cleared to come back to

Page 72

1       work.
2   Q.  Did you ever tell Dr. Elzein that this letter was
3       insufficient only because it was signed by a social worker?
4   A.  No.
5   Q.  Why not?
6   A.  I never had a conversation with Dr. Elzein about this
7       letter. The letter was sent -- was forwarded to us in
8       December.
9   Q.  And by "us" you're referring to you and Helena, correct?
10  A.  Yes.
11  Q.  Okay. You don't know when Marney might have received it, do
12      you?
13  A.  No.
14  Q.  You don't know -- well, do you know if -- were you aware
15      that Dr. Elzein gave this letter to Dr. Tajour, the
16      physician at employee health?
17  A.  I have -- I don't know.
18  Q.  And do you know who Dr. Yoon is that's referenced in
19      Exhibit 11?
20  A.  I don't know her or him. I don't know.
21  Q.  It's a him.
22  A.  Okay.
23  Q.  So what I want you to assume is Dr. Yoon is a psychiatrist
24      at Havenwyck Hospital.
25          So if this letter had been signed by Dr. Yoon