*EXHIBIT 5*

```
 1                  UNITED STATES DISTRICT COURT
 2                  EASTERN DISTRICT OF MICHIGAN
 3
 4
 5  AHMED ELZEIN,
 6        Plaintiff,
 7
 8     -vs-                              Case No. 22-CV-12352
 9
10  ASCENSION GENESYS HOSPITAL,
11        Defendant.
12  _____/
13
14
15
16        DEPONENT:   DR. BRADLEY CALOIA
17        DATE:      Thursday, October 12, 2023
18        TIME:      2:12 p.m.
19        LOCATION:  VIA ZOOM VIDEOCONFERENCE
20        REPORTER:  Karen Fortna, CRR/RMR/RPR/CSR-5067
21        JOB NO:    26455
22
23
24
25
```

Page 14

1  A.   I believe I received a call from the internal
2       medicine program director, Dr. Pawlaczyk, who
3       informed me that they were sending him down.
4  Q.   And was that a direct conversation between you and
5       Dr. Pawlaczyk?
6  A.   Yes, sir, it was.
7  Q.   And what did she tell you?
8  A.   I don't recall immediately.
9  Q.   Do you recall her describing it as she was
10      requesting a fitness for duty, though?
11 A.   Yes, specifically her concern was that she believed
12      this person was unfit for duty and needed, you
13      know, a medical clearance workup.
14 Q.   When did you first lay eyes on Dr. Elzein -- not
15      time, I mean, like where in the hospital,
16      physically within the hospital?
17 A.   They brought him into room 17, as memory serves,
18      and I saw him probably very close to immediately
19      after he arrived.
20 Q.   And that would have been within that particular
21      room of the emergency department; is that right?
22 A.   Yes.  We are separated into multiple, what we call,
23      pods or subsections of groups of rooms.  There
24      are -- well, there's three now; I believe there
25      were four at the time.  This would have been in the

Page 15

1       main treatment area or what we call pod A, I guess,
2       but the first 17 or 18 rooms are like pod A, the
3       primary core of the emergency room.
4  Q.   During your phone call with Dr. Pawlaczyk, did you
5       have an understanding that she had concerns about
6       Dr. Elzein's psychiatric condition?
7  A.   It was implied, sir.
8  Q.   In what sense was it implied?
9  A.   I don't recall the immediate words she used, but
10      there was concerns that he was either under the
11      influence of a substance or there were underlying
12      problems.  You know, the purpose of the ER visit is
13      for us to try to determine -- to make that
14      determination, that distinction.
15 Q.   Well, sure, but I mean, one of the first things you
16      do with any patient is get a history, correct?
17 A.   Of course.
18 Q.   And that history can come from the patient or from
19      other people who've made observations of the
20      patient, correct?
21 A.   It generally encompasses as much information as I
22      can gather from all sources.
23 Q.   So that's what I'm getting at.  So while -- the ER
24      is -- the role is to find out what's going on and
25      you're going to gather as much as you can from any

Page 16

1       source that you can at that point, correct?
2  A.   Sure, yeah.
3  Q.   So while you might not have a specific recollection
4       right now sitting here, do you believe you had a
5       specific conversation with Dr. Pawlaczyk about the
6       nature of her concerns?
7  A.   I know that I did.  And in addition to that, she
8       told me that another person raising concerns was a
9       fellow resident of Dr. Elzein's, whom I contacted
10      to get her impression as well.
11 Q.   Do you recall who that was?
12 A.   Last name is Baj or Baj, B-A-J.
13 Q.   Did you talk to Dr. Baj before seeing Dr. Elzein?
14 A.   I'm not sure, sir.  That's a good question.  I
15      don't know the answer.
16 Q.   Did you have --
17 A.   It was probably afterward.
18 Q.   Did you have more than one conversation with
19      Dr. Pawlaczyk about Dr. Elzein?
20 A.   At the end of the workup, I would have contacted
21      her, yes, to inform her that he was not coming back
22      to work.
23 Q.   Did you have more than one conversation with
24      Dr. Baj about Dr. Elzein?
25 A.   I'm not sure.

Page 17

1  Q.   Was your contact with Dr. Baj by phone or did you
2       see her in person, do you know?
3  A.   By phone.
4  Q.   Do you recall what she told you?
5  A.   Offhand, no.  They had -- I don't remember.  I
6       don't recall.  I would be guessing.
7  Q.   All right.  Is there an area of the emergency
8       department that is designated for persons coming in
9       with psychiatric concerns?
10 A.   No.
11 Q.   Does Ascension Genesys have a psychiatric unit?
12 A.   We do not have an in-patient psychiatric unit, no.
13 Q.   What do you recall about your initial interactions
14      with Dr. Elzein?
15 A.   He was agitated and defensive and showing some
16      signs of restlessness and agitation, swiftly moving
17      eyes, rocking back and forth, demanding to see
18      identification from every single person in the
19      room, making some, you know -- what's the word?  He
20      seemed persecutory.
21 Q.   Meaning he was expressing that he believed to be
22      the victim of persecution; is that how you're using
23      that word?
24 A.   Yes, delusions of persecution, assuming they were
25      delusions.

Page 30

1 Q. So again, you testified earlier that he told you
2 this, but you don't put it in here and you said
3 part of why you -- the purpose of this document is
4 for subsequent treating psychiatrist to understand
5 what's going on, correct?
6 A. Yes, that's true. I would like to review the chart
7 though.
8     MR. STEMPIEN: Take your time.
9     THE WITNESS: Is Exhibit 2 the chart?
10 Yeah, here it is.
11     (Marked for identification:
12     Deposition Exhibit No. 2.)
13     MR. STEMPIEN: Well, Exhibit 2 is only
14 three or four pages of it, so I don't want to
15 represent to you that it would be whatever it is
16 that you're looking for because I cherrypicked what
17 I wanted to present to you, but you're welcome to
18 look at the entire chart if you need a couple
19 minutes.
20     THE WITNESS: It's not all there.
21     MR. STEMPIEN: Not from what I gave you,
22 no.
23     THE WITNESS: Okay.
24     MR. STEMPIEN: I mean, I'm sure either
25 Dan or I can make that available to you if -- do

Page 31

1 you need to look at the entire chart?
2     THE WITNESS: If you're going to ask me
3 questions specifically regarding what he said to
4 me, it would be helpful.
5     MR. STEMPIEN: Sure. Absolutely.
6     MR. WASLAWSKI: Can we go off the record
7 real quick?
8     MR. STEMPIEN: Why don't we go off the
9 record, Karen.
10     THE REPORTER: We're off.
11     (Whereupon a break was taken
12     from 2:48 p.m. to 3:00 p.m.)
13     MR. STEMPIEN: Back on the record.
14 BY MR. STEMPIEN:
15 Q. All right. Dr. Caloia, have you had an opportunity
16 to review the chart?
17 A. I did.
18 Q. Okay. So then I would like to go back to my
19 earlier question about who told you this issue
20 regarding the bomb. Did Dr. Elzein personally tell
21 you from his own mouth that he thought somebody had
22 placed a bomb in the resident lounge area?
23 A. So according -- from what I'm gathering from the
24 chart, it seems that that specific information came
25 to my thought, my consciousness as a result of a

Page 32

1 conversation with the IM staff, but I can't say for
2 certain whether or not he told me because I didn't
3 document it.
4 Q. Okay. And then the same question with regard to
5 that people/co-workers were trying to harm him by
6 placing a toxic substance in his pocket.
7 A. There is a suggestion in the chart that he told me
8 that people were trying to harm him and bug him.
9 Q. All right. Bug him. And did he -- in what
10 context -- not context. In what manner did he mean
11 bug him, like audio recording or like bother him?
12 A. "...as demonstrated by believing people are
13 planting bombs around him and bugging him." That
14 is on 287, sir.
15     MR. STEMPIEN: Let me take a look.
16     By the way, Doctor, I'm completely
17 distracted because you have chickens walking around
18 behind you.
19     THE WITNESS: The rooster's a jerk.
20 Don't look at him.
21     MR. STEMPIEN: You said 287?
22     THE WITNESS: Yes, 000287.
23 BY MR. STEMPIEN:
24 Q. So are you referring to the section under the title
25 "Hospital Course"?

Page 33

1 A. Yes.
2 Q. And then it says, "Clinical Course," and a colon,
3 and it starts with the words, "I specifically
4 discussed..." Is that the paragraph you're
5 referring to?
6 A. Yes, sir.
7 Q. And does the "I" in that paragraph refer to you?
8 A. Me.
9 Q. So this references that you specifically discussed
10 the case with the program director, Dr. Pawlaczyk,
11 and also with fellow resident, Dr. Natalia Baj,
12 correct?
13 A. Yes.
14 Q. And then it says that you believe the patient is
15 having paranoid delusions and that he's "acutely a
16 danger to himself and possibly others as
17 demonstrated by believing people are planting bombs
18 around him and bugging him," correct?
19 A. Yes.
20 Q. But there's nothing in that sentence that
21 references that he's the one that made those
22 statements; is that accurate?
23 A. I did not specifically write the patient said this
24 to me.
25 Q. And do you have a specific recollection of the