**EXHIBIT 9**

```
 1                UNITED STATES DISTRICT COURT
 2                EASTERN DISTRICT OF MICHIGAN
 3
 4
 5  AHMED ELZEIN,
 6       Plaintiff,
 7
 8       -vs-                          Case No. 22-CV-12352
 9
10  ASCENSION GENESYS HOSPITAL,
11       Defendant.
12  _____/
13
14
15
16       DEPONENT:   KATHLEEN SCOTT, MSW
17       DATE:       Thursday, October 12, 2023
18       TIME:       3:45 p.m.
19       LOCATION:   VIA ZOOM VIDEOCONFERENCE
20       REPORTER:   Karen Fortna, CRR/RMR/RPR/CSR-5067
21       JOB NO:     26455
22
23
24
25
```

Page 46

1  treatment, then we need to do that legally.
2  Q. Right. There's a legal process that you have to
3     follow; is that correct?
4  A. Yes.
5  Q. And you've been trained in terms of what the legal
6     process is?
7  A. Yeah. I mean, Ascension specific, I mean, I don't
8     know if I ever received any formal training, but...
9  Q. I mean, in your entire career as a social worker,
10    have you been trained on --
11 A. Oh, yeah, yes, the Mental Health Code, absolutely,
12    everything.
13 Q. You're familiar with Michigan Mental Health Code?
14 A. I am.
15 Q. And you're familiar with the requirements of the
16    Mental Health Code of how somebody is to be
17    involuntarily committed, correct?
18 A. Correct.
19 Q. And that involves a petition to the probate court,
20    correct?
21 A. Right. We don't -- like that happens after they
22    get to the hospital. That's why the stuff at the
23    bottom, you'll see on the bottom of the petition,
24    once they get there, it's my understanding they go
25    through, they get a copy of both. And I always

Page 47

1  try -- like if somebody is not -- I try to check
2  the box on the second side that the hospitalization
3  needs to be pending a hearing. They absolutely
4  have the ability if they don't feel -- you know, to
5  talk to a judge. And that happens --
6  Q. After you -- hold on.
7     After you fill out the petition,
8     Exhibit 1, the first two pages of Exhibit 1, what
9     do you physically do with the document?
10 A. The original is on the chart and then it's faxed
11    like with that referral to facilities.
12 Q. So in this case, was it your understanding that
13    Dr. Elzein was transferred to Havenwick Hospital?
14 A. That was the plan. I don't know -- like I'm
15    assuming that's where he went, but yes.
16 Q. So Exhibit 1 -- actually the complete Exhibit 1,
17    which would be both the petition and the
18    certificate, in a normal process would have been
19    faxed to Havenwick?
20 A. Absolutely. They wouldn't have accepted a patient
21    without having that.
22 Q. Okay. Whose job is it to fax it to Havenwick?
23 A. That would be me.
24 Q. Did you fax Exhibit 1 to Havenwick?
25 A. Yes.

Page 48

1  Q. Did you maintain any of the fax transmittal
2     documents from that fax?
3  A. Not that I know of, no. That's not -- normally we
4     would not do that, no.
5  Q. Do you know for sure --
6  A. They would confirm, like, who we talked to. If
7     they hadn't received it, they wouldn't accept a
8     patient, you know what I mean, I mean, unless there
9     was some egregious error on their part, but I can't
10    imagine that happening.
11 Q. Well, did you ever attempt to see if anything was
12    ever filed in any probate court for Dr. Elzein?
13 A. No, but normally we would receive notification
14    because if we're the petitioner or person that does
15    the clinical cert, the physician, we would have,
16    from probate court, received something. Now I will
17    say, this hospital, sometimes we receive things
18    sporadically and very past due and I don't know if
19    that's a mail system issue here, but off the top of
20    my head, I cannot recall if I ever got anything,
21    but it's not uncommon to get probate court, like,
22    notifications. Most of the time the hearings are
23    way before I even get the notification.
24 Q. You were the petitioner in this particular request
25    to have Dr. Elzein confined to a psychiatric

Page 49

1  facility, correct?
2  A. Correct.
3  Q. You've done this before?
4  A. Absolutely, yeah.
5  Q. And are you generally involved with the court
6     process after that?
7  A. No, not at all.
8  Q. The courts don't want you to be involved?
9  A. Like I said, on a rare occasion we'll get a note
10    that somebody has requested a hearing, which is
11    their right, but most of the time that hearing has
12    already long past before I get notice of that.
13 Q. And you don't do anything to follow up if anybody
14    followed through and filed anything with the
15    probate court?
16 A. No, that's not -- and to my knowledge, that's not
17    an Ascension -- like that's not anything that
18    we're -- like it's not within our protocol.
19 Q. You're the person saying to the court, "You need to
20    have this person locked up against their will," and
21    that's what you're doing in Exhibit 1, correct?
22        MR. WASLAWSKI: Objection. Form.
23        THE WITNESS: I don't -- no, absolutely
24    not, and I object to that. Locked up against their
25    will? Absolutely not. Seen for a formal eval to