**EXHIBIT 17**

```
 1              UNITED STATES DISTRICT COURT
 2          FOR THE EASTERN DISTRICT OF MICHIGAN
 3
 4     AHMED ELZEIN,
 5          Plaintiff,                  Case No. 22-cv-12352
 6     vs                               Vol. 2
 7     ASCENSION GENESYS HOSPITAL,
 8          Defendant.
 9     _____/
10
11     DEPONENT:       MARNEY DAUGHERTY
12     DATE:           Monday, October 23, 2023
13     TIME:           9:33 a.m.
14     LOCATION:       Zoom Video Conference
15     REPORTER:       Heidi A. Cook, CSR-4827
16     Job No.:        26633
```

Page 34

1                And in your general practice as
2    a Human Resources professional, when you
3    communicate to an employee that they had not
4    met their return to work requirements, do you
5    generally do that in writing or verbally, or
6    does it vary?
7  A  It could vary.
8  Q  And when you explain that to the employees, do
9    you generally tell them why it was
10   insufficient?
11 A  Generally, yes, I would.
12 Q  Okay. If we could go back to Exhibit 6 for a
13   moment, which is the December 1st E-mail from
14   Dr. Elzein to you.
15 A  Yep. I have it up.
16 Q  Can you look about --
17       MS. LEBEAU: Give me a second to
18   get caught up. Okay. I've got it. Go ahead.
19 Q  (By Mr. Stempien) So the December 1st E-mail
20   from Dr. Elzein to you, about half way through
21   the second paragraph Dr. Elzein says, Just to
22   reaffirm that if determined on an objective
23   evidence, as accepted by Ascension policy, that
24   I require a fit for work assessment, I will
25   abide by this decision and Ascension may refer

Page 35

1    me to any occupational health physician of
2    their choice. I brought up my concerns about
3    Dr. Vosburgh, regarding him making a biased
4    assessment due to my experience with him where
5    he had a prior knowledge of my history without
6    my consent, as well as knowledge of my
7    educational performance.
8         Then he says, I am requesting a
9    fair and unbiased assessment from any
10   occupational health physician within Ascension
11   you recommend, be it within the State of
12   Michigan or anywhere in the U.S., even at my
13   own expense.
14        I am awaiting your reply
15   regarding my return to work following your
16   receipt of my clearance note sent yesterday.
17        Did you respond to this E-mail,
18   if you recall?
19 A  I don't recall. I'd have to see if I have an
20   E-mail.
21 Q  So did you take Dr. Elzein up on sending him to
22   any other occupational health physician other
23   than Dr. Vosburgh?
24 A  No.
25 Q  Why?

Page 36

1  A  Because he needed to see Dr. Vosburgh to be
2    returned to work.
3  Q  There was no other physician that could return
4    him to work other than Dr. Vosburgh, anywhere
5    in the United States he says even; there was
6    nobody?
7  A  We asked him to be seen by Dr. Vosburgh, and he
8    agreed, and asked me to E-mail him appointment
9    times, and he never responded.
10 Q  Okay. But here he asks to be seen by any other
11   occupational health physician other than
12   Dr. Vosburgh, correct?
13       MS. LEBEAU: I'll object to the
14   form of the question. I don't think that's
15   actually what it says, but go ahead.
16       THE WITNESS: He said -- he did
17   not say, I will not be seen by Dr. Vosburgh; he
18   says, I am requesting a fair and unbiased
19   assessment from any occupational health
20   physician within Ascension that you recommend.
21 Q  (By Mr. Stempien) Okay. Did you suggest any
22   other occupational physicians?
23 A  No.
24 Q  Did it have to be Dr. Vosburgh?
25 A  Yes.

Page 37

1  Q  And so Dr. Vosburgh, God forbid he died,
2    Dr. Elzein would never be allowed to return to
3    work because there's nobody else that could do
4    it?
5         MS. LEBEAU: Object to form and
6    foundation. Come on, counsel.
7  Q  (By Mr. Stempien) Okay. But my point is, it
8    could have been another physician, right, it
9    didn't have to be Vosburgh, right?
10        MS. LEBEAU: Asked and answered.
11 Q  (By Mr. Stempien) Okay. So it had to be
12   Vosburgh. Okay. Why did it have to be
13   Vosburgh?
14 A  That's who we asked him to go see to be
15   returned to work.
16 Q  Is that the only reason?
17 A  I don't know.
18        MS. LEBEAU: Counsel, are you
19   going to mark these exhibits; I don't think
20   we've been marking them as we've been going
21   along. I just want to make sure I --
22        MR. STEMPIEN: Yeah. I don't
23   know. Do we actually -- I mean, we're in Zoom
24   so I don't usually mark them. I guess any
25   exhibit I mention, Michelle, my intent is to

Page 58

1 He told you that he felt
2 intimidated, correct?
3 A I'm looking at my notes, because I remember him
4 saying he was uncomfortable; I remember him
5 saying he was stressed. I'm looking to see if
6 I documented intimidated.
7 Q It's in the paragraph on November 11, 2020.
8 It's the second to last line.
9 A Okay. Thank you.
10 Q Sure.
11 A Yes, he claimed that security was there with a
12 wheelchair to intimidate him.
13 Q Right. And then he also, in the last line,
14 said he felt scared at that point, and then
15 went to the ER?
16 A Yes, correct.
17 Q So being intimidated or being, describing being
18 intimidated into going to the ER, a complaint
19 like that, is that something that HR would be
20 involved in?
21 A Yes. Earlier, I thought you were asking if I
22 would investigate his care in the ER. I would
23 not investigate his care in the ER.
24 Q And I realize that, and that's why I backed up.
25 I did a poor job of laying the foundation for

Page 59

1 what I was asking.
2 So now what I'm looking at is
3 that intimidating and feeling scared portion of
4 it. Did you take any steps to investigate
5 those complaints about being intimidated into
6 going into the ER?
7 A I investigated when I talked to Dr. Baj, or
8 Natalia, and Dr. Pawlaczyk. If I'm remembering
9 correctly, I talked about, where was security,
10 where was the wheelchair. I asked those
11 questions, yes.
12 Q And I didn't mark them as exhibits, but there
13 are a couple documents. You did fill out
14 documents of notes that you took while you
15 were, as a result of your interviews of
16 Dr. Pawlaczyk and Dr. Baj, correct?
17 A Correct.
18 Q Other than talking to those two, did you take
19 any other steps with regard to an investigation
20 of the allegations that he had been intimidated
21 into going into the ER?
22 A I did not. I talked to them. There was a
23 written statement from Dr. Natalia, there's a
24 written, but that is what I reviewed.
25 Q Okay. All right. Did you review any of his

Page 60

1 medical records?
2 A No.
3 Q Dr. Elzein's?
4 A No.
5 Q Did you talk to any of the ER staff members
6 about Dr. Elzein and the November 11th
7 hospitalization?
8 A No, I don't believe I talked to any of them. I
9 helped -- I helped arrange interviews, but I
10 don't believe I was part of those interviews.
11 Q When you say arranged interviews, what do you
12 mean?
13 A For our attorney.
14 Q Oh, okay. That's fine. Yeah. I don't want to
15 know what the attorneys did.
16 All right. Any other
17 arrangements that you made for those people to
18 be interviewed by any non-attorneys?
19 A No.
20 Q After your interviews with Dr. Baj and
21 Dr. Pawlaczyk, did you close your investigation
22 into the allegations that Dr. Elzein made on
23 November 30th?
24 A Yes.
25 Q Did you make any findings?

Page 61

1 A No.
2 Q Okay. And then in Exhibit 5, the last
3 paragraph, Dr. Elzein, when you're alone with
4 him, expressed concerns about being seen by
5 Dr. Vosburgh, correct?
6 A Yes.
7 Q And is the nature of his concern was that he
8 had his medical information and his work
9 performance deficiencies, correct?
10 A Yes.
11 Q He also told you that Dr. Vosburgh made him
12 feel uncomfortable, correct?
13 A Yes.
14 Q Did you ever consider having him seen by any
15 other doctor other than Dr. Vosburgh for a
16 fitness for duty?
17 A No.
18 Q Did you ever talk to Dr. Vosburgh about
19 Dr. Elzein's concerns, about being seen by him?
20 A I don't remember what conversation I had with
21 Dr. Vosburgh.
22 Q Did you speak to Dr. Vosburgh about Dr. Elzein
23 at all?
24 A I would have to review my notes, or look back.
25 I know there was communication with, I don't